1    Robert C. Moest, Of Counsel, SBN 62166
2    **THE BROWN LAW FIRM, P.C.**
     2530 Wilshire Boulevard, Second Floor
3    Santa Monica, California 90403
     Telephone: (310) 915-6628
4    Facsimile: (310) 915-9897
     Email: RMoest@aol.com

5    *Counsel for Plaintiff*

6    [Additional Counsel on Signature Page]

7                    **UNITED STATES DISTRICT COURT**
8                    **NORTHERN DISTRICT OF CALIFORNIA**

9

10   KENNETH BLEVINS, derivatively on
     behalf of PALO ALTO NETWORKS,          Case No.:
11   INC.,

                         Plaintiff,
12                                           DEMAND FOR JURY TRIAL
13            v.

14                                           **VERIFIED SHAREHOLDER**
15   NIKESH ARORA, NIR ZUK, APARNA          **DERIVATIVE COMPLAINT**
     BAWA, JOHN M. DONOVAN, CARL
16   ESCHENBACH, HELENE D. GAYLE,
     JAMES J. GOETZ, JOHN KEY, MARY
17   PAT MCCARTHY, LORRAINE
     TWOHILL, DIPAK GOLECHHA, and
18   LEE KLARICH,

19                       Defendants,

20

21            and

22
     PALO ALTO NETWORKS, INC.,
23                    Nominal Defendant.

24

25

26                          **INTRODUCTION**

27        Plaintiff Kenneth Blevins ("Plaintiff"), by Plaintiff's undersigned attorneys,
28

derivatively and on behalf of nominal defendant Palo Alto Networks, Inc. ("Palo Alto" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Nikesh Arora ("Arora"), Nir Zuk ("Zuk"), Aparna Bawa ("Bawa"), John M. Donovan ("Donovan"), Carl Eschenbach ("Eschenbach"), Helene D. Gayle ("Gayle"), James J. Goetz ("Goetz"), John Key ("Key"), Mary Pat McCarthy ("McCarthy"), Lorraine Twohill ("Twohill"), Dipak Golechha ("Golechha"), and Lee Klarich ("Klarich"), (collectively, the "Individual Defendants," and together with Palo Alto, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Palo Alto, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act against Defendants Arora, Golechha and Klarich. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Palo Alto, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the directors and/or officers of Palo Alto from August 18, 2023 through February 20, 2024, both dates inclusive (the "Relevant Period").

2.      Palo Alto is a Delaware corporation located in California. The Company operates as a cybersecurity company that offers a platform and services for network

security, cloud security, security operations, and threat intelligence and security counseling. Palo Alto's platform purports to help secure enterprise users by delivering cybersecurity backed by artificial intelligence ("AI") and automation.

3.      Prior to the Relevant Period, Palo Alto enhanced its offerings in an effort to become a more comprehensive cybersecurity platform by eliminating stand-alone products and consolidating point solutions into existing platforms. In so doing, Palo Alto's "platformization" strategy sought to decrease the complexity of dealing with various solutions from various vendors.

4.      Throughout the Relevant Period, the Individual Defendants made a series of false and misleading statements to investors and the public that failed to disclose: (i) the unfavorable facts regarding the Company's platformization efforts; (ii) Palo Alto's new AI offerings; and (iii) the strength of customer demand. As a result of the foregoing, Palo Altos' public statements were materially false and misleading at all relevant times.

5.      The truth emerged on February 20, 2024, when Palo Alto reported its financial results for the second quarter of 2024 and lowered third quarter 2024 guidance for fiscal year 2024, (the "February 20, 2024, Press Release").

6.      On that same day, in an earnings call, Defendant Arora stated that the lowered guidance was a "consequence of us driving a shift in our strategy in wanting to accelerate both our platformization and consolidation and activating our AI leadership." Defendant Arora went on to reveal that the U.S. Federal Government deals for multiple projects did not close. As a result, the "significant shortfall in our U.S. federal government business" is expected to continue into the third and fourth quarter of 2024. Defendant Arora also reported that Palo Alto was "worsened in Q2."

7.      On this news, the price of the Company's stock plunged to $104.12 per share, or approximately 28%, to close at $261.97 per share on February 21, 2024.

8.      During the Relevant Period, the Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these

false and misleading statements and omissions of material fact while seven of the Individual Defendants engaged in insider trading while the Company's stock was artificially inflated from the Individual Defendants' false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and caused Palo Alto to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) the Company's platformization and consolidation initiatives were not being adopted by customers and therefore not driving increased market share; (ii) as a result, the Company's new AI offerings were not facilitating platformization and consolidation; (iii) the Company needed to increase platformization, free product offerings, and other incentives to attract new customers; (iv) Palo Alto's high billing growth was not sustainable; (iv) the Company could not close deals with the U.S. Federal Government in Fiscal Year 2024; and (v) as a result, there was a substantial risk that the Company would be forced to revise Fiscal Year 2024 expectations. As a result, Individual Defendants' representations regarding the Company's business, operations, and prospects were materially misleading at all relevant times.

9.      In further breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls while seven of the Individual Defendants engaged in lucrative insider trading, reaping personal profits ***exceeding $265 million.***[1]

10.      In light of the Individual Defendants' misconduct—which has subjected the Company and Defendants Arora, Golechha, and Klarich to two federal securities fraud class action lawsuits pending in the United States District Court for the Northern District of California (the "Securities Class Actions"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein— the Company will

---

[1] All emphasis is added unless otherwise noted.

have to expend many millions of dollars.

11.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

12.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of certain directors' and officers' liability in the Securities Class Actions, and of their not being disinterested and/or independent directors, a majority of the Company's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

14.    Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

15.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17.    Venue is proper in this District because Palo Alto's principal executive offices are in this District. In addition, a substantial portion of the transactions and wrongs

complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

18.    Plaintiff is a current shareholder of Palo Alto. Plaintiff has continuously held Palo Alto common stock at all relevant times. Plaintiff is a citizen of Virginia.

### Nominal Defendant Palo Alto

19.    Palo Alto is a Delaware corporation with its headquarters at 3000 Tannery Way, Santa Clara, CA, 95054. Palo Alto's common stock trades on the Nasdaq Stock Market ("Nasdaq") under the ticker symbol "PANW."

### Defendant Arora

20.    Defendant Arora has served as the Company's CEO and as Chairman of the Board since June 2018. According to the proxy statement the Company filed on Schedule 14A with the SEC on October 27, 2023 (the "2023 Proxy Statement"), as of September 21, 2023, Defendant Arora beneficially owned 3,943,428 shares of the Company's common stock, constituting 1.3% of the total outstanding common stock of the Company as of that date. Given that the price per share of the Company's common stock at the close of trading on September 21, 2023 was $227.44, Defendant Arora owned approximately $896,893,264 worth of Palo Alto stock as of that date.

21.    For the fiscal year ended July 31, 2023 (the "2023 Fiscal Year"), Defendant Arora received $151,425,203 in total compensation from the Company. This included $750,000 in salary, $145,374,318 in stock awards, $1,500,000 in non-equity incentive plan compensation, and $3,800,885 in all other compensation.

22.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Arora made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|

| 11/22/2023 | 40,848 | $267.31 | $10,919,242 |
| 11/24/2022 | 30,678 | $266.15 | $8,164,826 |
| 11/27/2023 | 178,474 | $268.38 | $47,899,030 |
| 12/11/2023 | 5,240 | $300.01 | $1,572,062 |
| 12/12/2023 | 300,000 | $304.00 | $91,201,200 |

Thus, in total, before the fraud was exposed, he sold 555,240 shares of Company stock on inside information, for which he received approximately $159,756,360 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

23.     Upon information and belief, Defendant Arora is a citizen of California.

24.     The 2023 Proxy Statement stated the following about Defendant Arora:

Nikesh Arora has served as the Chair of our Board and Chief Executive Officer since June 2018. Prior to joining us, from 2016 through 2018 Mr. Arora was an angel investor and from June 2016 through December 2017, Mr. Arora served as an advisor to SoftBank Group Corp., a multinational conglomerate company ("SoftBank"). From July 2015 through June 2016, Mr. Arora served as president and chief operating officer of SoftBank and from July 2014 through June 2015, Mr. Arora served as vice chair and chief executive officer of SoftBank Internet and Media, a subsidiary of SoftBank. Prior to SoftBank, from December 2004 through July 2014, Mr. Arora held multiple senior leadership operating roles at Google, Inc., including serving as senior vice president and chief business officer, from January 2011 to June 2014. Mr. Arora also serves on the board of Compagnie Financiere Richemont S.A., a public Switzerland-based luxury goods holding company. Mr. Arora previously served on the boards of Sprint Corp., a communications services company, from November 2014 to June 2016, Colgate-Palmolive Company, a worldwide consumer products company focused on the production, distribution and provision of household, health care and personal care products, from March 2012 to September 2014, SoftBank from 2014 to 2016, and Yahoo! Japan, an internet company, from 2015 to 2016. Mr. Arora holds an M.S. in Business Administration from Northeastern University, an M.S. in Finance from Boston College, and a B.Tech in electrical engineering from the Institute of Technology at Banaras Hindu University.

Mr. Arora was chosen to serve on our Board due to his leadership skills and experience as the chief architect of the Company's strategic vision, as well as

his thorough knowledge of all aspects of our business. Through his extensive career in executive leadership, he brings expertise in leading and scaling technology businesses, risk management oversight, and in-depth knowledge of the cybersecurity and technology sectors.

**Defendant Zuk**

25.     Defendant Zuk is a founder of the Company. Defendant Zuk has served as the Company's Chief Technology Officer ("CTO") and a Company director since March 2005. According to the 2023 Proxy Statement, as of September 21, 2023, Defendant Zuk beneficially owned 3,338,372 shares of the Company's common stock, constituting 1.1% of the total outstanding common stock of the Company as of that date. Given that the price per share of the Company's common stock at the close of trading on September 21, 2023, was $227.44 Defendant Zuk owned approximately $759,279,327 worth of Palo Alto stock as of that date.

26.     For the 2023 Fiscal Year, Defendant Zuk received $8,086,212 in total compensation from the Company. This included $419,515 in salary, $6,961,334 in stock awards, $629,272 in non-equity incentive plan compensation, and $76,091 in all other compensation.

27.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Zuk made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 12/01/2023 | 36,000 | $294.48 | $10,601,172 |
| 01/02/2024 | 36,000 | $288.63 | $10,390,536 |
| 02/01/2024 | 36,000 | $338.53 | $12,187,116 |

Thus, in total, before the fraud was exposed, he sold 108,000 shares of Company stock on inside information, for which he received approximately $33,178,824 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

28.     Upon information and belief, Defendant Zuk is a citizen of California.

29.     The 2023 Proxy Statement stated the following about Defendant Zuk:

Nir Zuk is one of our founders and has served as our Chief Technology Officer and as a member of our Board since March 2005. From April 2004 to March 2005, Mr. Zuk was Chief Security Technologist at Juniper Networks, Inc., a supplier of network infrastructure products and services. From September 2002 until its acquisition by Juniper in April 2004, Mr. Zuk was Chief Technology Officer at NetScreen Technologies, Inc., a provider of ASIC-based Internet security systems. In December 1999, Mr. Zuk co-founded OneSecure, Inc., a provider of prevention and detection appliances, and was Chief Technical Officer until its acquisition by NetScreen in September 2002. From 1994 to 1999, Mr. Zuk served in several technical roles, including Principal Engineer at Check Point Software Technologies Ltd., an enterprise software security company. Mr. Zuk attended Tel Aviv University where he studied Mathematics.

Mr. Zuk is a co-founder of Palo Alto Networks, a network security expert and brings a wealth of network security knowledge and industry experience to Palo Alto Networks. He brings business leadership, operational experience, risk management oversight experience, and experience developing technology. He has an in-depth knowledge of the technology and cybersecurity industries.

**Defendant Bawa**

30.     Defendant Bawa has served as a Company director since May 2021. Defendant Bawa also serves as a member of the Audit and Compensation and People Committees. According to the 2023 Proxy Statement, as of September 21, 2023, Defendant Bawa beneficially owned 711 shares of the Company's common stock, constituting less than 1% of the total outstanding common stock of the Company as of that date. Given that the price per share of the Company's common stock at the close of trading on September 21, 2023 was $227.44, Defendant Bawa owned approximately $161,709 worth of Palo Alto stock as of that date.

31.     For the 2023 Fiscal Year, Defendant Bawa received $356,383 in total compensation from the Company. This included $356,383 in stock awards.

32.     Upon information and belief, Defendant Bawa is a citizen of California.

33.     The 2023 Proxy Statement stated the following about Defendant Bawa:

Aparna Bawa has served as a member of our Board since May 2021. Ms. Bawa has served as the Chief Operating Officer of Zoom Video Communications, Inc., a video communications company, since May 2020. Ms. Bawa served as Zoom's Chief Legal Officer from August 2019 to May 2020, its General Counsel from September 2018 to May 2020 and its Secretary from December 2018 to November 2020. Prior to Zoom Video Communications, Ms. Bawa served as Senior Vice President and General Counsel of Magento, Inc., an e-commerce platform company, from June 2017 until its acquisition by Adobe Inc. in June 2018. From November 2012 to May 2017, Ms. Bawa served as Vice President, General Counsel and Secretary of Nimble Storage, Inc., an enterprise flash storage company, which was acquired by Hewlett Packard Enterprise in April 2017. Ms. Bawa holds a B.Sc. in Accounting from Marquette University and a J.D. from Harvard Law School.

Ms. Bawa was selected to serve on our Board due to her senior leadership and management experience at public technology companies, risk management oversight expertise, and legal and business operations expertise. She has extensive experience in technology companies.

### Defendant Donovan

34.     Defendant Donovan has served as a Company director since September 2012. Defendant Donovan also serves as a member of the Compensation and People Committee. According to the 2023 Proxy Statement, as of September 21, 2023, Defendant Donovan beneficially owned 142,275 shares of the Company's common stock, constituting less than 1% of the total outstanding common stock of the Company as of that date. Given that the price per share of the Company's common stock at the close of trading on September 21, 2023, was $227.44, Defendant Donovan owned approximately $32,359,026 worth of Palo Alto stock as of that date.

35.     For the 2023 Fiscal Year, Defendant Donovan received $413,931 in total compensation from the Company. This included $413,931 in stock awards.

36.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Donovan made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 01/08/2024 | 20,136 | $287.83 | $5,795,785 |
| 01/09/2024 | 15,100 | $300.06 | $4,530,981 |
| 01/12/2024 | 7,000 | $330.03 | $2,310,189 |
| 01/16/2021 | 8,000 | $300.03 | $2,673,243 |
| 02/07/2024 | 1,700 | $366.01 | $622,225 |
| 02/08/2024 | 69,240 | $367.19 | $25,424,235 |

Thus, in total, before the fraud was exposed, he sold 121,176 shares of Company stock on inside information, for which he received approximately $41,356,658 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

37.     Upon information and belief, Defendant Donovan is a citizen of California.

38.     The 2023 Proxy Statement stated the following about Defendant Donovan:

John M. Donovan has served as a member of our Board since September 2012. Since May 2019, Mr. Donovan has served as Chair of The President's National Security Telecommunications Advisory Committee. Mr. Donovan worked at AT&T Inc., a provider of telecommunication services, since April 2008, first as Chief Technology Officer and subsequently as Chief Executive Officer—AT&T Communications until his resignation, effective October 1, 2019. From November 2006 to April 2008, Mr. Donovan was Executive Vice President of Product, Sales, Marketing and Operations at Verisign. From November 2000 to November 2006, Mr. Donovan served as Chair and CEO of inCode Telecom Group Inc., a provider of strategy and consulting services to the telecommunications industry. Prior to joining inCode, Mr. Donovan was a Partner with Deloitte Consulting where he was the Americas industry practice director for telecommunications. Mr. Donovan serves on the board of directors of Lockheed Martin Corporation, an aerospace, defense and technology company. Mr. Donovan holds a B.S. in Electrical Engineering

from the University of Notre Dame and an M.B.A. from the University of Minnesota.

Mr. Donovan was selected to serve on our Board because of his technical knowledge and extensive business leadership, management, operations and risk management oversight experience, as a result of serving as the Chief Technology Officer and later the Chief Executive Officer of AT&T Communications. He is skilled in overseeing global information, software development, supply chain, network operations and big data organizations and has expertise in cybersecurity, artificial intelligence and machine learning.

**Defendant Eschenbach**

39.    Defendant Eschenbach has served as a Company director since May 2013. According to the 2023 Proxy Statement, as of September 21, 2023, Defendant Eschenbach beneficially owned 16,436 shares of the Company's common stock, constituting less than 1% of the total outstanding common stock of the Company as of that date. Given that the price per share of the Company's common stock at the close of trading on September 21, 2023 was $227.44, Defendant Eschenbach owned approximately $3,738,203 worth of Palo Alto stock as of that date.

40.    For the 2023 Fiscal Year, Defendant Eschenbach received $337,254 in total compensation from the Company. This included $337,254 in stock awards.

41.    Upon information and belief, Defendant Eschenbach is a citizen of California.

42.    The 2023 Proxy Statement stated the following about Defendant Eschenbach:

Carl Eschenbach has served as a member of our Board since May 2013. Mr. Eschenbach is Co-CEO of Workday, Inc., an on-demand financial management and human capital management software vendor, a position he has held since December 2022. Prior to Workday, Mr. Eschenbach was a general partner at Sequoia Capital Operations, LLC, a venture capital firm, since April 2016. Prior to joining Sequoia Capital Operations, LLC, Mr. Eschenbach served as Chief Operating Officer and President of VMware, Inc., a provider of cloud and virtualization software and services, a role he held from December 2012 to February 2016. Mr. Eschenbach previously served as VMware's President and Chief Operating Officer from April 2012 to December 2012, as VMware's Co-President, Customer Operations from January 2011 to April 2012 and as VMware's Executive Vice President of

Worldwide Field Operations from May 2005 to January 2011. Prior to joining VMware in 2002, he was Vice President of North America Sales at Inktomi from 2000 to 2002. Mr. Eschenbach also held various sales management positions with 3Com Corporation, Lucent Technologies Inc. and EMC. Mr. Eschenbach currently serves on the board of Workday, Inc. Mr. Eschenbach received an electronics technician diploma from DeVry University.

Mr. Eschenbach was selected to serve on our Board because of his extensive experience in the technology industry and his previous public company management experience. He brings to our Board over 30 years of operational and sales experience in the technology industry, and has extensive experience in risk management oversight and scaling large organizations, as well as a deep knowledge of high-growth companies. Mr. Eschenbach also has extensive public company board experience.

**Defendant Gayle**

43.    Defendant Gayle has served as a Company director since May 2021. According to the 2023 Proxy Statement, as of September 21, 2023, Defendant Gayle beneficially owned 8,119 shares of the Company's common stock, constituting less than 1% of the total outstanding common stock of the Company as of that date. Given that the price per share of the Company's common stock at the close of trading on September 21, 2023 was $227.44, Defendant Gayle owned approximately $1,846,585 worth of Palo Alto stock as of that date.

44.    For the 2023 Fiscal Year, Defendant Gayle received $346,738 in total compensation from the Company. This included $346,738 in stock awards.

45.    Upon information and belief, Defendant Gayle is a citizen of Georgia.

46.    The 2023 Proxy Statement stated the following about Defendant Gayle:

Dr. Helene D. Gayle has served as a member of our Board since May 2021. Dr. Gayle has been President of Spelman College since July 2022. Prior to this position, Dr. Gayle served as President and Chief Executive Officer of The Chicago Community Trust, a community foundation dedicated to improving the Chicago region through strategic grant making, civic engagement and inspiring philanthropy, from 2017 to 2022. Dr. Gayle previously served as Chief Executive Officer of McKinsey Social Initiative, an independent non-profit organization, from 2015 to 2017 and as President

and Chief Executive Officer of CARE USA, a leading international humanitarian organization, from 2006 to 2015. From 2001 to 2006, she was an executive in the Global Health program at the Bill & Melinda Gates Foundation. Dr. Gayle began her career in public health at the U.S. Centers for Disease Control in 1984, and held positions of increasing responsibility over her 20-year tenure there, ultimately becoming the director of the National Center for HIV, STD and TB Prevention and achieving the rank of Assistant Surgeon General and Rear Admiral in the United States Public Health Service. Dr. Gayle earned a Bachelor of Arts degree in Psychology from Barnard College of Columbia University, an M.D. from University of Pennsylvania and a Masters in Public Health from Johns Hopkins University. She currently serves as a member of the board of directors of The Coca-Cola Company, a beverage company, and Organon & Co., a pharmaceutical company. Dr. Gayle previously served as a member of the board of directors of Colgate-Palmolive Company, a global consumer products company, from 2010 to 2021.

Dr. Gayle was selected to serve on our Board because of her senior leadership and chief executive officer experience and broad international exposure and emerging market experience, as well as her governmental and non-profit expertise, risk management expertise and corporate governance experience as a director of private and public companies.

**Defendant Goetz**

47.     Defendant Goetz has served as a Company director since April 2005. Defendant Goetz also serves as a member of the Audit Committee. According to the 2023 Proxy Statement, as of September 21, 2023, Defendant Goetz beneficially owned 201,132 shares of the Company's common stock, constituting less than 1% of the total outstanding common stock of the Company as of that date. Given that the price per share of the Company's common stock at the close of trading on September 21, 2023 was $227.44, Defendant Goetz owned approximately $45,745,462 worth of Palo Alto stock as of that date.

48.     Upon information and belief, Defendant Goetz is a citizen of Florida.

49.     The 2023 Proxy Statement stated the following about Defendant Goetz:

James J. Goetz has served as a member of our Board since April 2005. Mr.

Goetz has been a managing member of Sequoia Capital Operations, LLC, a venture capital firm, since June 2004, where he focuses on cloud, mobile, and enterprise companies. Mr. Goetz currently serves on the board of directors of Intel Corporation and several privately held companies. Mr. Goetz has previously served on the boards of directors of Barracuda Networks, Inc., a data security and storage company from 2009 to 2017, Nimble Storage, Inc., a data storage company, from 2007 to 2017, Jive Software, Inc., a provider of social business software, from 2007 until 2015, and Ruckus Wireless, Inc., a manufacturer of wireless (Wi-Fi) networking equipment, from 2012 until 2015. Mr. Goetz holds an M.S. in Electrical Engineering with a concentration in Computer Networking from Stanford University and a B.S. in Electrical Engineering with a concentration in Computer Engineering from the University of Cincinnati.

Mr. Goetz was selected to serve on our Board because of his senior leadership, technology, information technology (IT), business development and cybersecurity experience, and knowledge of emerging technologies, arising from his experience as a partner of a venture capital firm, where he focuses on cloud mobile, and enterprise technology investments, as well as providing guidance and counsel to a wide variety of internet and technology companies. He also brings his experience as a senior management leader in network, data security and storage, software, and manufacturing companies, through various senior roles and other board experiences. Mr. Goetz also has extensive public company board experience.

**Defendant Key**

50.     Defendant Key has served as a Company director since April 2019 and also serves as Chair of the Audit Committee. Defendant Key also serves as Chairperson of the Compensation and People Committee and is a member of the Audit Committee. According to the 2023 Proxy Statement, as of September 21, 2023, Defendant Key beneficially owned 15,073 shares of the Company's common stock, constituting less than 1% of the total outstanding common stock of the Company as of that date. Given that the price per share of the Company's common stock at the close of trading on September 21, 2023 was $227.44, Defendant Key owned approximately $3,428,203 worth of Palo Alto stock as of that date.

51.     For the 2023 Fiscal Year, Defendant Key received $380,335 in total

compensation from the Company. This included $380,335 in stock awards.

52.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Key made the following sale of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 12/18/2023 | 2,297 | $308.74 | $709,175 |

Thus, in total, before the fraud was exposed, he sold 2,297 shares of Company stock on inside information, for which he received approximately $709,175 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

53.     Upon information and belief, Defendant Key is a citizen of New Zealand.

54.     The 2023 Proxy Statement stated the following about Defendant Key:

Right Honorable Sir John Key has served as a member of our Board since April 2019. Sir John was a Member of Parliament for Helensville in New Zealand until April 2017. Sir John served as Prime Minister of New Zealand from November 2008 to December 2016 having commenced his political career as a Member of Parliament for Helensville in July 2002. Prior to his political career, he had a nearly twenty-year career in international finance, primarily for Bankers Trust of New Zealand and Merrill Lynch in Singapore, London and Sydney. Sir John serves as the chair and member of the board of directors of ANZ Bank New Zealand Ltd and is a member of the board of directors of the parent Australia & New Zealand Banking Group Ltd, a public bank that provides various banking and financial products and services and also serves on the board of directors of several privately held companies. He previously served on the board of directors of Air New Zealand Limited, a public airline, from 2017 to 2020. Sir John has a Bachelor of Commerce in Accounting from the University of Canterbury.

Sir John was selected to serve on our Board due to his global business leadership and extensive financial, capital markets, and management expertise as former Prime Minister of New Zealand, his extensive background in foreign affairs, and his career in investment banking and finance. He brings

extensive experience in policy-making and a global business perspective from his experience and service on other boards, which is especially valuable to us as we grow internationally.

**Defendant McCarthy**

55.     Defendant McCarthy has served as a Company director since October 2016. Defendant McCarthy also serves as Chair of the Audit Committee. According to the 2023 Proxy Statement, as of September 21, 2023, Defendant McCarthy beneficially owned 201,132 shares of the Company's common stock, constituting less than 1% of the total outstanding common stock of the Company as of that date. Given that the price per share of the Company's common stock at the close of trading on September 21, 2023 was $227.44, Defendant McCarthy owned approximately $45,745,462 worth of Palo Alto stock as of that date.

56.     For the 2023 Fiscal Year, Defendant McCarthy received $370,850 in total compensation from the Company. This included $370,850 in stock awards.

57.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant McCarthy made the following sale of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 12/11/2023 | 1,000 | $298.31 | $298,306 |

Thus, in total, before the fraud was exposed, she sold 1,000 shares of Company stock on inside information, for which she received approximately $298,306 in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the scheme.

58.     Upon information and belief, Defendant McCarthy is a citizen of Arizona.

59.     The 2023 Proxy Statement stated the following about Defendant McCarthy:

Mary Pat McCarthy has served as a member of our Board since October 2016. Ms. McCarthy, now retired, served as Vice Chair of KPMG LLP, the U.S. member firm of the global audit, tax and advisory services firm, until 2011

after attaining such position in 1998. She joined KPMG LLP in 1977 and became a partner in 1987. She held numerous senior leadership positions in the firm, including Executive Director of the KPMG Audit Committee Institute from 2008 to 2011, Leader of the KPMG Client Care program from 2007 to 2008, U.S. Leader, Industries and Markets from 2005 to 2006, and Global Leader, Information, Communication and Entertainment Practice from 1998 to 2004. Ms. McCarthy also served on KPMG's Management and Operations Committees. Ms. McCarthy earned a Bachelor of Science degree in Business Administration from Creighton University and completed the University of Pennsylvania Wharton School's KPMG International Development Program. Ms. McCarthy serves as a director of Micron Technology, Inc., a producer of semiconductor devices and previously served on the board of directors of Mutual of Omaha, an insurance company, from 2012 to 2018 and Andeavor Corporation (formerly Tesoro Corporation), a global energy corporation from 2012 to 2018.

Ms. McCarthy was selected to serve on our Board because of her deep technical expertise in financial and accounting matters from her experience as the Vice Chair of KPMG LLP, advising numerous companies on financial and accounting matters, as well as her leadership experience as a member of management at KPMG. She is an "audit committee financial expert" with over 40 years of experience in finance, operations and risk management oversight of technology companies, particularly publicly traded companies with knowledge of complex global financial and business matters. In addition, she brings a global business perspective and contributes valuable insights and perspectives to our business and operations from her service on other boards.

**Defendant Twohill**

60.    Defendant Twohill has served as a Company director since April 2019. According to the 2023 Proxy Statement, as of September 21, 2023, Defendant Twohill beneficially owned 18,132 shares of the Company's common stock, constituting less than 1% of the total outstanding common stock of the Company as of that date. Given that the price per share of the Company's common stock at the close of trading on September 21, 2023 was $227.44, Defendant Twohill owned approximately $4,123,942 worth of Palo Alto stock as of that date.

61.    For the 2023 Fiscal Year, Defendant Twohill received $361,045 in total compensation from the Company. This included $361,045 in stock awards.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

62.     Upon information and belief, Defendant Twohill is a citizen of California.

63.     The 2023 Proxy Statement stated the following about Defendant Twohill:

Lorraine Twohill has served as a member of our Board of directors since April 2019. Ms. Twohill currently serves as Google LLC's (formerly Google, Inc.) Chief Marketing Officer, a position she has held since June 2009. From July 2003 until June 2009, Ms. Twohill served as Google's Head of Marketing Europe, Middle East and Africa. Ms. Twohill previously served on the board of directors of Williams-Sonoma, Inc., a consumer retail company that sells kitchenwares and home furnishings, from January 2012 until May 2017. Ms. Twohill holds joint honors degrees in International Marketing and Languages from Dublin City University.

Ms. Twohill was selected to serve on our Board due to her leadership skills and extensive marketing knowledge, with over 25 years of experience. She has deep management and business operations experience, as well as risk management oversight experience. She provides the Board with valuable insights into brand management and the global issues facing technology companies today.

**Defendant Golechha**

64.     Defendant Golechha has served as the Company's CFO since March 2021. Previously, Defendant Golechha served as the Company's Senior Vice President. According to the 2023 Proxy Statement, as of September 21, 2023, Defendant Golechha beneficially owned 78,043 shares of the Company's common stock, constituting less than 1% of the total outstanding common stock of the Company as of that date. Given that the price per share of the Company's common stock at the close of trading on September 21, 2023 was $227.44, Defendant Golechha owned approximately $17,750,099 worth of Palo Alto stock as of that date.

65.     For the 2023 Fiscal Year, Defendant Golechha received $9,381,668 in total compensation from the Company. This included $600,00 in salary, $7,879,645 in stock awards, $900,00 in non-equity incentive plan compensation, and $2,023 in all other compensation.

66.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Golechha made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 12/13/2024 | 2,500 | $305.04 | $762,600 |
| 03/01/2024 | 2,500 | $311.53 | $778,824 |

Thus, in total, before the fraud was exposed, he sold 5,000 shares of Company stock on inside information, for which he received approximately $1,541,424 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

67.     Upon information and belief, Defendant Golechha is a citizen of California.

68.     The 2023 Proxy Statement stated the following about Defendant Golechha:

Dipak Golechha has served as our Chief Financial Officer since March 2021. Mr. Golechha joined the Company in December 2020 as Senior Vice President, Finance. Prior to joining the Company, from August 2020 until December 2020, Mr. Golechha served as senior advisor at Boston Consulting Group, a management consulting firm. From December 2016 to April 2020, Mr. Golechha was President and Chief Executive Officer of Excelligence Learning Corporation, a tech-enabled platform company in early childhood education. From August 2014 through July 2016, Mr. Golechha served as the chief financial officer of NBTY Inc., also known as The Nature's Bounty Company, a manufacturer of vitamins, minerals and health supplements. During 2014, Mr. Golechha served as the chief financial officer of Chobani, a yogurt company. Prior to Chobani, Mr. Golechha worked at The Procter & Gamble Company, an American multinational consumer goods corporation, for 18 years, most recently serving as chief financial officer / chief operating officer of the Global Feminine Care / Adult Care Division from August 2012 to December 2013. Mr. Golechha holds a bachelor's degree and a master's degree from St. John's College, Cambridge University in Economics.

**Defendant Klarich**

69.     Defendant Klarich has served as the Company's Chief Technology Officer ("CTO") since August 2017. Defendant Klarich previously served as the Company's Executive Vice President of Product Management. According to the 2023 Proxy Statement, as of September 21, 2023, Defendant Klarich beneficially owned 2,349,014 shares of the Company's common stock, constituting less than 1% of the total outstanding common stock of the Company as of that date. Given that the price per share of the Company's common stock at the close of trading on September 21, 2023, was $227.44, Defendant Klarich owned approximately $534,259,744 worth of Palo Alto stock as of that date.

70.     For the 2023 Fiscal Year, Defendant Klarich received $17,092,370 in total compensation from the Company. This included $550,00 in salary, $ 15,685,347 in stock awards, $825,000 in non-equity incentive plan compensation, and $32,023 in all other compensation.

71.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Klarich made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 12/04/2023 | 45,000 | $288.82 | $12,997,034 |
| 01/29/2024 | 45,000 | $343.33 | $15,449,805 |

Thus, in total, before the fraud was exposed, he sold 90,000 shares of Company stock on inside information, for which he received approximately $28,446,839 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

72.     Upon information and belief, Defendant Klarich is a citizen of California.

73.     The 2023 Proxy Statement stated the following about Defendant Klarich:

Lee Klarich has served as our Chief Product Officer since August 2017. Prior to this appointment, Mr. Klarich served as our Executive Vice President of

Product Management, a role he held since November 2015. From November 2012 to November 2015, Mr. Klarich served as our Senior Vice President, Product Management and our Vice President, Product Management from May 2006 to November 2012. Prior to joining us, Mr. Klarich held various positions at NetScreen Technologies, Juniper Networks, Excite@Home, and Packard Bell-NEC. Mr. Klarich holds a B.S. in Engineering from Cornell University.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

74.     By reason of their positions as officers, directors, and/or fiduciaries of Palo Alto and because of their ability to control the business and corporate affairs of Palo Alto, the Individual Defendants owed Palo Alto and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Palo Alto in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Palo Alto and its shareholders so as to benefit all shareholders equally.

75.     Each director and officer of the Company owes to Palo Alto and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

76.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Palo Alto, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

77.     To discharge their duties, the officers, and directors of Palo Alto were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

78.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its

property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Palo Alto, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

79. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

80. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Palo Alto were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Palo Alto's corporate governance and applicable codes of

conduct and/or ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Palo Alto conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Palo Alto and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Palo Alto's operations would comply with all applicable laws and Palo Alto's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

81.     Each of the Individual Defendants further owed to Palo Alto and the

shareholders the duty of loyalty requiring that each favor Palo Alto's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

82.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Palo Alto and were at all times acting within the course and scope of such agency.

83.     Because of their advisory, executive, managerial, directorial, and controlling positions with Palo Alto, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

84.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Palo Alto.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

85.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

86.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance,

future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

87.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Palo Alto was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

88.    Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

89.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Palo Alto and was at all times acting within the course and scope of such agency.

## PALO ALTO'S CODE OF CONDUCT & ETHICS

90.    Palo Alto's Code of Conduct and Ethics (the "Code of Conduct") guides all directors, officers, and employees of Palo Alto and its subsidiaries. The "Introduction" to the Code of Conduct states the following:

> This Code of Business Conduct and Ethics (the "**Code of Conduct**") summarizes the ethical standards and key policies that guide the business

conduct of the directors, officers and employees of Palo Alto Networks, Inc. and its subsidiaries, affiliates and related entities (the "**Company**").

The purpose of this Code of Conduct is to promote ethical conduct and deter wrongdoing. The policies outlined in this Code of Conduct are designed to ensure that the Company's employees, including its officers (collectively referred to herein as "employees"), and members of its board of directors ("directors") act in accordance with not only the letter but also the spirit of the laws and regulations that apply to the Company's business. In addition to being bound by all other provisions of this Code of Conduct, the CEO and senior financial officers are subject to the Code of Ethics for CEO and Senior Financial Officers included in this Code of Conduct. The Company expects its employees and directors to exercise good judgment to uphold these standards in their day-to-day activities and to comply with all applicable policies and procedures in the course of their relationship with the Company.

Employees and directors are expected to read the policies set forth, or referenced, in this Code of Conduct and ensure that they understand and comply with them. All employees and directors are required to abide by the Code of Conduct. Employees are expected to communicate requirements outlined in this code and best practices to the Company's agents, represen-tatives, contractors and consultants with whom they work to ensure that they too conduct themselves appropriately when doing business on the Company's behalf.

The Code of Conduct does not cover every issue that may arise, but it provides general guidelines for exercising good judgment. Employees and directors should refer to the Company's other policies and procedures for implementing the general principles set forth below. Any questions about the Code of Conduct or the appropriate course of conduct in a particular situation should be directed to the Company's Global Ethics and Compliance Team (**compliance@paloaltonetworks. com**). Any violations of laws, rules, regulations or this Code of Conduct should be reported immediately, as described in this Code of Conduct. The Company will not allow retaliation against an employee or director for such a report made in good faith. Employees and directors who violate this Code of Conduct may be subject to disciplinary action up to and including termination of employment.

91.    Under the heading "Compliance with Laws, Rules, and Regulations," the Code of Conduct states:

Employees and directors must comply, both in letter and spirit, with all laws, rules and regulations applicable to the Company and its business, as well as applicable Company policies and procedures. Each employee and director must acquire appropriate knowledge of the legal requirements relating to his or her duties sufficient to enable him or her to recognize potential problems and to know when to seek advice when they become aware of actions that are inconsistent with this Code. Violations of laws, rules and regulations may subject the violator to individual criminal or civil liability, as well as to discipline in accordance with local law. Any questions as to the applicability of any law, rule or regulation may be directed to the Company's Legal Department.

92.    In a section titled "Insider Trading," the Code of Conduct states:

Buying or selling stock, or telling others to buy or sell stock, on the basis of material, non-public information is called "insider trading" and is illegal. The purpose of the Company's insider trading policy is to establish guidelines to ensure that all employees and directors comply with laws prohibiting insider trading. No employee or director in possession of material, non-public information may trade the Company's securities (or advise others to trade) from the time they obtain such information until after adequate public disclosure of the information has been made. Anyone—including employees and directors—who knowingly trades Company securities while in possession of material, non-public information or who tips information to others will be subject to appropriate disciplinary action up to and including termination. Insider trading is also a crime.

Employees and directors also may not trade in the shares of other companies about which they learn material, non-public information through the course of their employment or service with the Company, nor may advise others to trade based on such non-public information.

Please review the Company's Insider Trading Policy.

Any questions as to whether information is material or has been adequately disclosed should be directed to the Company's General Counsel. Consult the Legal Department if you have any questions regarding insider trading.

93.    In a section titled "Record-Keeping," the Code of Conduct states, in relevant part:

All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the transactions and matters to which they relate and must conform both to applicable legal requirements and to the Company's system of internal controls. All assets of the Company must be carefully and properly accounted for. Similarly, all time and expense/cost records and reports must be accurate. The making of false or misleading records or documentation is strictly prohibited. Unrecorded funds or assets should not be maintained.

Employees must comply with all laws and regulations regarding the preservation of records. Records should be retained or destroyed only in accordance with the Company's document retention policies. Any questions about these policies should be directed to recordsretention@paloalto-networks.com or compliance@paloaltonetworks.com, as appropriate. Employees should also consult the Company's Anti-Corruption Policy.

94.     In a section titled "Disclosure," the Code of Conduct states, in relevant part:

The information in the Company's public communications, including filings with the Securities and Exchange Commission, must be full, fair, accurate, timely and understandable. All employees and directors are responsible for acting in furtherance of this policy. In particular, each employee and director is responsible for complying with the Company's disclosure controls and procedures and internal controls for financial reporting through the appropriate channels, as established in the reporting section of this Code of Conduct. Any questions concerning the Company's disclosure controls and procedures and internal controls for financial reporting should be directed to the Company's Chief Financial Officer or General Counsel, as appropriate.

Anyone that believes that questionable accounting or auditing conduct or practices have occurred or are occurring should follow the Reporting section of this Code, or direct questions to their supervisors or the Legal Department.

95.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Section 14(a) of the Exchange Act. Moreover, seven of the Individual

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Defendants violated the Code of Conduct by engaging in insider trading. Additionally, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## PALO ALTO'S AUDIT COMMITTEE CHARTER

96.     Palo Alto's Audit Committee Charter opens by stating that the "Purpose" of the Audit Committee is to:

> The purpose of the Audit Committee is to assist the Board of Directors (the "Board") of Palo Alto Networks, Inc. (the "Company") in fulfilling its responsibilities for generally overseeing:
>
> - The Company's accounting and financial reporting processes and internal controls as well as the audit and integrity of the Company's financial statements.
>
> - The qualifications, independence and performance of the Company's independent registered public accounting firm (the "independent auditor").
>
> - The performance of the Company's internal audit function.
>
> - The Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements).
>
> - Risk assessment and risk management pertaining to the financial, accounting and tax matters of the Company.
>
> The Audit Committee is also responsible for preparing the report required by Securities and Exchange Commission ("SEC") rules to be included in the Company's proxy statement for the annual meeting of stockholders, and for performing such other duties and responsibilities as are enumerated in on consistent with this charter.

97.     In a section titled "Responsibilities," the Palo Alto Audit Committee Charter tasks the Audit Committee with the following regarding the review of financial statements:

The Audit Committee shall review and discuss the following with management, the Company's internal auditors (the "internal auditors"), if applicable, and the independent auditor, as applicable: In a section titled "Legal and Regulatory Compliance," the Audit Committee Charter states:

- The scope, timing and approach, as well as the materiality thresholds for, of the annual audit of the Company's financial statements.

- The Company's annual audited and quarterly financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations," and recommend to the Board whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Form 10-K.

- The results of the independent audit and the quarterly reviews of the Company's financial statements, and the independent auditor's opinion on the annual financial statements, including any critical counting matters (CAMs) identified in the auditor's report.

- The reports and certifications regarding internal control over financial reporting and disclosure controls and procedures.

- Major matters regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles. The Audit Committee shall consider the judgment of both management and the independent auditor about the quality, not just the acceptability, of accounting principles.

- Analyses prepared by management or the independent auditor setting forth significant financial reporting matters and judgments made in connection with the preparation of the financial statements.

- The effect of regulatory requirements and accounting pronouncements on the Company's financial statements.

- Any significant changes required or taken in the audit plan as a result of any material control deficiency.

Verified Shareholder Derivative Complaint

- Any problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the independent auditor's activities or on access to requested information and management's response.

- Any significant disagreements between management and the independent auditor.

98.    In a section titled "Legal and Regulatory Compliance," the Palo Alto Audit Committee Charter states:

The Audit Committee shall oversee and discuss, as needed, with management, the internal auditors and the independent auditor: (i) the overall adequacy and effectiveness of the Company's ethical compliance programs, including (but not limited to) the Company's Code of Business Conduct and Ethics (except to the extent related to conflicts of interest, which is subject to the oversight of the ESG and Nominating Committee of the Board); and (ii) reports regarding compliance with applicable laws, regulations and internal compliance programs (including compliance with the Foreign Corrupt Practices Act, foreign anticorruption laws and export control regulations) in each case to the extent pertaining to financial, accounting and/or tax matters. The Audit Committee shall discuss with management and the independent auditor any correspondence with regulators or governmental agencies, including any comment letters issued by the SEC with respect to the Company's public filings and any published reports that raise material issues regarding the Company's financial statements or accounting policies. The Audit Committee shall discuss with the Company's general counsel legal matters thar may have material impact on the financial statements.

99.    Regarding "Oversight," the Palo Alto Audit Committee Charter states:

The Company's management is responsible for preparing accurate and complete financial statements in accordance with GAAP, preparing periodic reports, and establishing and maintaining appropriate and satisfactory accounting principles, financial reporting policies and internal control over financial reporting. The Company's independent auditor is responsible for auditing and reviewing the Company's financial statements, reviewing quarterly financial statements, and evaluating the effectiveness of the Company's internal control over financial reporting. The Audit Committee is responsible for assisting the Board in overseeing the conduct of these activities by management and the independent auditor. The Audit Committee

is not responsible for preparing, providing any expert or special assurance as to, or guaranteeing the financial statements or the independent auditor's work. It is recognized that the members of the Audit Committee are not employees of the Company, that it is not the duty or responsibility of the Audit Committee or its members to conduct "field work" or other types of auditing or accounting reviews or procedures; to set auditor independence standards; or ensure that the financial statements or periodic reports are complete and accurate, conform to GAAP, or otherwise comply with applicable laws and the Company's policies. Each member of the Audit Committee shall be entitled to rely on: (i) persons and organizations within and outside the Company from which the Audit Committee receives information, and (ii) the accuracy of the financial and other information provided to the Audit Committee, either instance absent actual knowledge to the contrary.

100.   In violation of the Palo Alto Audit Committee Charter, Defendants McCarthy, Key, Goetz, and Bawa conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Section 14(a) of the Exchange Act. Moreover, in violation of the Palo Alto Audit Committee Charter, Defendants McCarthy, Key, Goetz, and Bawa failed to maintain the accuracy of Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Palo Alto Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

101.   Palo Alto is a Delaware corporation located in California. The Company provides cybersecurity services internationally in four core areas: network security, cloud security, security operations, and threat intelligence and security counseling. Palo Alto's

products range from hardware and software firewalls to subscription-based services such as advanced threat protection, security services, and cloud security.

102.    Palo Alto's security operations division involves security automation, security analytics, endpoint security, and attack surface management solutions through Cortex XSIAM (which employs AI technology), Cortex XDR, Cortex XSOAR, and Cortex Xpanse.

103.    Cortex XSIAM is advertised as the "AI security automation platform for the modern SOC, harnessing the power of AI to radically improve security outcomes and transform security operations."

104.    At the start of the Relevant Period, Defendant Arora portrayed Cortex XSIAM and Palo Alto's wider AI offerings in the following fashion: "[w]e continue to drive platformization and capitalize on the opportunity the changing landscape presents for products like XSIAM." He further emphasized that the Company was "uniquely positioned in the industry" to produce AI-based outcomes to its customers.

105.    Shortly thereafter, in November 2023, Defendant Klarich further emphasized the progress of Cortex XSIAM and AI's capabilities to improve Palo Alto by stating that the Company saw "very strong" customer interest in its AI technology and automation for the "fastest sort of growth of a new product that we've ever seen."

106.    Before the Relevant Period, the Company reported consistent growth in revenue and billings—a "key financial metric" according to Palo Alto—that provides "investors with an important indicator of the health and visibility of our business because it includes subscription and support revenue, which is recognized ratably over the contractual service period, and product revenue, which is recognized at the time of hardware shipment or delivery of software license." Indeed, in the last five years, the Company has dramatically widened its product offerings, and in the process, has emerged as a holistic cybersecurity platform. This growth has led to Palo Alto making the consolidation of customers a key strategy for the Company moving forward.

107.    During the Relevant Period, Palo Alto maintained that the Company's consolidation of customers and "platformization" initiatives were powering the Company's growth. For instance, Defendant Arora made the following representation in November 2023, that Palo Alto "launched an AI-enabled cloud manager in network security to continue our consolidation and platformization efforts towards Zero Trust." Zero trust is a strategic cybersecurity method that validates each and every stage of a digital interaction. Defendant Golechha also represented during the Relevant Period that "we see strong demand in the market and continue to see customers make a technical selection of offerings across our portfolio."

108.    Simultaneously, the Company faced staunch competition from other cybersecurity-focused companies, including CrowdStrike, Zscaler, Cloudflare, and Microsoft. For instance, in May 2023, Crowdstrike released a new generative AI cybersecurity system of its own, coined Charlotte AI and another AI and automation-centered tool, Falcon for IT, in September 2023. Just months later, in November 2023, Microsoft enhanced its cybersecurity offerings with AI when it released Microsoft Security Copilot, a new generative AI solution that was marketed as a Zero trust solution intended to make a "flywheel of protection to change the asymmetry of the digital threat landscape[.]"

109.    However, contrary to the Individual Defendants' representations that there was "strong demand in the market," "strong interest across our next-generation security portfolio," and that "platformization is continuing to drive large deal momentum," the Company was languishing the cybersecurity market's crowded and competitive environment. Consequently, the Individual Defendants left investors and the public completely in the dark as to Palo Alto's need to implement customer incentives to sustain growth and that the Company's impressive growth in its billing metric—a self-proclaimed key metric—was not sustainable.

110. During the Relevant Period, the Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact while seven of the Individual Defendants engaged in insider trading while the Company's stock was artificially inflated from the Individual Defendants' false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and caused Palo Alto to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) the Company's platformization and consolidation initiatives were not being adopted by customers and therefore not driving increased market share; (ii) as a result, the Company's new AI offerings were not facilitating platformization and consolidation; (iii) the Company needed to increase platformization, free product offerings, and other incentives to attract new customers; (iv) Palo Alto's high billing growth was not sustainable; (iv) the Company could not close deals with the U.S. Federal Government in Fiscal Year 2024; and (v) as a result, there was a substantial risk that the Company would be forced to revise Fiscal Year 2024 expectations. As a result, Individual Defendants' representations regarding the Company's business, operations, and prospects were materially misleading at all relevant times.

111. In further breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls while seven of the Individual Defendants engaged in lucrative insider trading, reaping personal profits *exceeding $265 million.*

## **False and Misleading Statements**

### *August 18, 2023 Earnings Conference Call*

112. On August 18, 2023, the Company held an earnings conference call regarding its 2023 Fiscal Year results. During the call, Defendant Arora stated the following about Palo Alto's platformization, in relevant part:

> This quarter, we added more new ARR than any other pure-play cybersecurity company. ***Our platformization is continuing to drive large deal momentum.***

One way to illustrate the traction of our next-generation security capability across network security, cloud security and SOC automation, so look at the makeup of some of our largest deals.

\*\*\*

***We continue to drive platformization and capitalize on the opportunity the changing landscape presents for products like XSIAM.*** We continued with our go-to-market transformation. For example, we consolidated our SASE sales team into our core a year ago, and we had a strong outcome, as you saw, with some large transactions and opportunities across the pipeline.

\*\*\*

We talked about platformization or you've heard that word, you will keep hearing it to the next sort of 45 minutes from our team because we believe that's the way to deliver security, is resonating with our customers. ***Our customers are seeing it. My team is going to show you some amazing UI.*** I think you're going to start seeing not only just we're talking about this sort of the next level of platformization. You will start seeing, right after me, how we actually bring it to life. So I cannot be more excited about some of the work we're doing on the product side, stuff that we haven't shown anybody yet. You are going to see it today because it's important for us not just to talk about it, be able to show you how we're going to deliver.

***So you will see a next level of integration and how we can deliver security outcomes. You'll see sneak peeks into how we're going to leverage AI copilots in each of our products to create the simplicity and usability that security has not had, to be honest, so far. So I couldn't be more excited about how our teams are going to keep driving more and more platformization, more and more integration***, where things of integrating best-of-breed vendors as sort of DIY or do it yourself or do it home is going to be a thing of the past.

113.    Defendant Arora also discussed the Company's future AI capabilities. Defendant Arora emphasized the following:

***And over the next possibly 3, 6, 9 months, you will see more and more capability delivered to our customers using that generative AI framework or predictive AI or precision AI framework.*** I think in the next 3 to 5 years, that is going to fundamentally change what Palo Alto is able to do out there in the market. And as I said, we cannot do this without the best people.

***September 7, 2023 Conference Call***

114.   On September 7, 2023, the Company held a conference call with analysts and investors. During the call, an analyst inquired about whether Palo Alto could attain the security "equivalent of a Workday or a Salesforce or a ServiceNow" after the development of "consolidated platforms in cybersecurity[,]" as Defendant Arora had priorly stated, with the "3 platforms [network security, cloud security, and SOC transformation] you have today?"

115.   Defendant Arora replied: "***Yes. Yes. I think our newest platform around the SOC is -- has tremendous potential. I think that's kind of the integrated platform***. Most of our competitors in that space are 15-year old tech. I think it's the CrowdStrike, Palo Alto, SentinelOne moment that happened to endpoints, which is happening to SOC except to standard SOCs."

### *October 27, 2023 Proxy Statement*

116.   On October 27, 2023, the Company filed its 2023 Proxy Statement with the SEC. Defendants Donovan, Key, McCarthy, Zuk, Twohill, Gayle, Goetz, Arora, Bawa, and Eschenbach solicited the 2023 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

117.   The 2023 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) re-elect Defendants Arora, Bawa, Eschenbach, and Twohill to the Board for a three-year term; (2) ratify the appointment of Ernst & Young LLP as the independent registered public accounting firm of the Company for the 2023 Fiscal Year; (3) approve, on an advisory basis, the Company's executive compensation; and (4) approve an amendment to the 2021 Palo Alto Networks, Inc. Equity Incentive Plan ("2021 Incentive Plan") to increase the number of shares reserved for issuance under the 2021 Incentive Plan.

118.   Regarding "The Board's Role in Risk Oversight," the 2023 Proxy Statement stated the following, in relevant part:

Risk is inherent with every business, including strategic, financial, business and operational, legal and compliance, and reputational. We have designed

and implemented processes to manage risk in our operations. Management is responsible for the day-to-day management of risks our Company faces, while our Board, as a whole and assisted by its committees, has responsibility for the oversight of risk management. In its risk oversight role, our Board has the responsibility to satisfy itself that the risk management processes designed and implemented by management are appropriate and functioning as designed.

Our Board believes that open communication between management and our Board is essential for effective risk management and oversight.

While our Board is ultimately responsible for risk oversight, our Board committees assist our Board in fulfilling its oversight responsibilities in certain areas of risk.

119.   Regarding Palo Alto's Code, the 2023 Proxy Statement stated the following: Our Board has adopted Corporate Governance Guidelines. These guidelines address items such as the qualifications and responsibilities of our directors and director candidates and corporate governance policies and standards applicable to us in general. In addition, our Board has adopted a Code of Business Conduct and Ethics that applies to all our employees, officers and directors, including our Chief Executive Officer, Chief Financial Officer, and other executive and senior financial officers. Our Corporate Governance Guidelines and our Code of Business Conduct and Ethics are posted on the Investor Information portion of our website at investors.paloaltonetworks.com. We will post amendments to our Code of Business Conduct and Ethics or waivers of our Code of Business Conduct and Ethics for directors and executive officers on the same website.

120.   The 2023 Proxy Statement was materially false and misleading because it failed to disclose that, *inter alia*, that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading  statements.

121.   The 2023 Proxy Statement was also materially false and misleading because it failed to disclose, *inter alia*, that: (i) the Company's platformization and consolidation

initiatives were not being adopted by customers and therefore not driving increased market share; (ii) as a result, the Company's new AI offerings were not facilitating platformization and consolidation; (iii) the Company needed to increase platformization, free product offerings, and other incentives to attract new customers; (iv) Palo Alto's high billing growth was not sustainable; (iv) the Company could not close deals with the U.S. Federal Government in Fiscal Year 2024; and (v) as a result, there was a substantial risk that the Company would be forced to revise Fiscal Year 2024 expectations.

122.   As a result of Defendants Donovan, Key, McCarthy, Zuk, Twohill, Gayle, Goetz, Arora, Bawa, and Eschenbach causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to re-elect Defendants Arora, Bawa, Eschenbach, and Twohill to the Board, thus allowing them to continue breaching their fiduciary duties to the Company and approve an amendment to the 2021 Incentive Plan to increase the number of shares reserved for issuance under the 2021 Incentive Plan.

### *November 15, 2023, Earnings Call*

123.   On November 15, 2023, the Company held an earnings conference call. During this call, Defendant Arora reported the progress of Palo Alto's platformization and consolidation. Defendant Arora stated:

> On the macroeconomic front, business practices continue to adapt and adjust to new normal with higher interest rates for longer. Internally, on the product side, we've had one of the strongest starts to our fiscal year. In addition to various recognitions, we have delivered strong innovation across all 3 platforms. ***We launched an AI-enabled cloud manager in network security to continue our consolidation and platformization efforts towards Zero Trust.***
>
> ***
>
> ***We continue to see strong interest across our next-generation security portfolio, and we're making progress on our platformization journey.*** I'll highlight a few deals to talk about the diversity of opportunity, cross-platform buys as well as the geographical distribution of our deals.

*For example, a federal government agency signed a $25 million expansion transaction, including adding Cortex XDR and Prisma Access in highly competitive situations, expanding their network security footprint. This customer has now spent over $100 million over its lifetime across our [ chief ] platform*. A large global SaaS provider signed an $18 million Prisma Cloud transaction to consume modules across the portfolio. The customer is already a customer for our network security and Cortex platforms. A large educational organization expanded its relationship with us in the first  quarter  in  a  $15 million transaction, adding XSIAM, Prisma Cloud  and  an expansion of its network security footprint. And lastly, a nation state signed a $28 million deal. That is a first of its kind, standardizing on both SASE and XSIAM. *This is a long sales cycle and represents our systematic approach to platformization.*

124.   In reporting the progress of the Company's new products and consolidation efforts, Defendant Arora stated:

Let's turn on to updates from our 3 platforms that are the engine driving our success. First, in network security.We continue to drive innovation across our portfolio and see momentum as customers drive towards Zero Trust architecture. This month, we *unveiled PAN-OS 11.1 or Cosmos and Strata Cloud Manager, unifying the management of all of our 3 form factors and all security services in a single pane of glass and also leveraging AI to analyze security policies, reduce risk configurations and predict and prevent disruptions.*

*Customers who invest in our platform by deploying all 3 form factors continue to grow rapidly, up 34%. Of our top 100 network security customers, 60% have purchased all 3 form factors, up from 53% a year ago. On average, these platform customers spend more than 15x of the rest of our network security customer spend.*

125.   In replying to an analyst's inquiry pertaining to the Cortex XSIAM pipeline, Defendant Klarich stated the following:

*Yes, were -- look, we've obviously over the last few quarters talked about XSIAM, and the interest we're seeing from customers is very strong. And it's been the fastest sort of growth of a new product that we've ever seen*. I think it speaks to a couple of things. One is just the need in the market from customers to go through the SOC transformation. Nikesh talked about the speed of attacks increasing relative to disclosure requirements and things like

that. And obviously, the number of attacks simply going up as well. ***That's driving the technology need to have a different solution, a better solution, one driven by AI and automation. And that's exactly how XSIAM was built, and that is what's fueling the interest.***

***The second part of this is with XSIAM, we're able to replace several of the customers' legacy point solutions in the SOC. So we are consolidating multiple independent piece parts with a single XSIAM deployment. And third, with each deployment of XSIAM, this is a significant investment the customer is making in us. So it would vary with those [ investments ] for 3-year investments, in some cases, even longer, because they are standardizing their SOC on a new platform. They want that long-term runway with us. This is not a short-term decision they're making. So all of those factors are what are fueling the strong pipeline that we shared and the early customer success we're having with XSIAM.***

126. Addressing the use of heavy discounts and deferred payment terms, Defendant Golechha assured investors that the Company had a firm financial position. Defendant Golechha stated:

Before turning to guidance, I want to frame some of the impacts that we're seeing on our billings. As Nikesh noted, ***we see strong demand in the market and continue to see customers make a technical selection of offerings across our portfolio. From here, we see more customers asking for deferred payment terms either with annual billings, financing through PANFS or pursuing external financing. Some customers are looking for additional discounts for upfront payments as they grapple with the cost of money. Our strong financial position, which includes $7 billion in cash, cash equivalents and investments, combined with our many options in dealing with this dynamic, gives us significant flexibility***. This can impact our billings trends quarter-to-quarter, and we're reducing our billings guidance to account for this through the fiscal year 2024.

127. Defendant Arora also gave a report on Palo Alto's billing metric and financial flexibility, stating:

In Q1, the cost of money remained a constant discussion and customers' significant focus on this topic is becoming the new normal. The way it manifests itself in our business is that there's always a payment and duration discussion in final renegotiations. ***Given our strong balance sheet,***

*we can use a mix of strategies to navigate the environment. This includes annual billing plans, financing through PANFS and partner financing. Whilst this does not impact our business demand or impact to annual revenue or annual metrics, it does create variability on total billings more than before, depending on financing use or the duration of contracts.*

*I am not concerned about the demand for cybersecurity for this quarter and upcoming quarters nor am I concerned about our ability to execute. The billings variability is a pure consequence of the payment conversations that we're having with our customers, and this is validated by the fact that we continue to see strong RPO and low churn, suggesting this is a cosmetic impact to our business.*

*November 29, 2023 UBS Technology Conference*

128.   On November 29, 2023, Defendant Arora attended the UBS Technology Conference on behalf of Palo Alto. During the conference, Defendant Arora responded to an analyst's inquiry pertaining to the competitive standing of the Company in the following way:

The way I think about competition, remember, 5 years ago, we had 1.5% market share of $180 billion market. We're probably at 3.5% now, which means 96% of the time, somebody else has got the business. This -- I live happily with competition. It's great. It's wonderful, drives more innovation. ***Our platformization continues to get us more and more share.*** The more people that are in the market, the more innovation there is, the more they could tell customers and saying, listen, you should move to SASE.

129.   The aforementioned statements referenced in ¶¶ 112-115 and 123-128 were materially false and misleading when made because they failed to disclose *inter alia*, that: (i) the Company's platformization and consolidation initiatives were not being adopted by customers and therefore not driving increased market share; (ii) as a result, the Company's new AI offerings were not facilitating platformization and consolidation; (iii) the Company needed to increase platformization, free product offerings, and other incentives to attract new customers; (iv) Palo Alto's high billing growth was not sustainable; (iv) the Company could not close deals with the U.S. Federal Government in Fiscal Year 2024; and (v) as a result, there was a substantial risk that the Company would be forced to revise Fiscal Year 2024 expectations. As a result, Individual Defendants' representations regarding the

Company's business, operations, and prospects were materially misleading at all relevant times.

### The Truth Emerges

*February 20, 2024 Press Release*

130.   The truth emerged on February 20, 2024.  After the market closed, Palo Alto released its second quarter fiscal 2024 financial results and significantly lowered its full year revenue and billing guidance. Specifically, the press release revealed total billings growth of two to four percent and revenue growth between thirteen and fifteen percent. The press release featured a statement from Defendant Arora: "With this backdrop, we are activating our accelerated platformization and consolidation strategy, as well as our AI leadership strategy."

*February 20, 2024 Earnings Call*

131.   On that same day, in an earnings call, Defendant Arora revealed that Palo Alto's "guidance is a consequence of us driving a shift in our strategy in wanting to accelerate both our platformization and consolidation and activating our AI leadership." Consequently, he announced that the Company would "***bear the cost of the transition through lower upfront financial outcomes***."

132.   Importantly, Defendant Arora admitted that Palo Alto would now "expect a typical customer entering into a platformization transaction ***will not pay us for our technology for a period of time***." Defendant Arora partly attributed the situation to "spending fatigue in cybersecurity."

133.   Defendant Arora also revealed that, although the Company was "positioned well for several large projects where we had requisite certifications and one technical selection" for several U.S. Federal Government deals, "these deals did not close," which resulted in "a significant shortfall in our U.S. federal government business" expected to

continue into the third and fourth quarters of 2024. Defendant Arora alleged, "the situation started off towards the end of Q1" and "worsened in Q2."

134.   The Press Release for the second quarter of 2024 reported the following revised expectations, in relevant part:

For the fiscal third quarter 2024, we expect:

- ***Total billings in the range of $2.30 billion to $2.35 billion, representing year-over-year growth of between 2% and 4%.***
- ***Total revenue in the range of $1.95 billion to $1.98 billion, representing year-over-year growth of between 13% and 15%.***
- Diluted non-GAAP net income per share in the range of $1.24 to $1.26, using 347 million to 351 million shares outstanding.

For the fiscal year 2024, we are updating guidance and expect:

- ***Total billings in the range of $10.10 billion to $10.20 billion, representing year-over-year growth of between 10% and 11%.***
- ***Total revenue in the range of $7.95 billion to $8.00 billion, representing year-over-year growth of between 15% and 16%.***
- Non-GAAP operating margin in the range of 26.5% to 27.0%.
- Diluted non-GAAP net income per share in the range of $5.45 to $5.55, using 345 million to 347 million shares outstanding.
- Adjusted free cash flow margin in the range of 38.0% to 39.0%.

135.   On this news, Palo Alto's common stock fell $104.12 per share, from a closing price of $366.09 on February 21, 2024 to close at $261.97 per share, a 28.4% decline, on February 21, 2024.

## DAMAGES TO PALO ALTO

136.   As a direct and proximate result of the Individual Defendants' conduct, Palo Alto has lost and will continue to lose and expend many millions of dollars.

137.   Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Actions, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

138.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

139.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

140.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

141.    Moreover, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company, including the personal profits of the four Individual Defendants who engaged in lucrative insider sales, netting proceeds of approximately $265 million during the Relevant Period.

142.    As a direct and proximate result of the Individual Defendants' conduct, Palo Alto has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

143.    Plaintiff brings this action derivatively and for the benefit of Palo Alto to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Palo Alto, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Exchange Act.

144.    Palo Alto is named solely as a nominal party in this action. This is not a

collusive action to confer jurisdiction on this Court that it would not otherwise have.

145.   Plaintiff is, and has been during the Relevant Period, a shareholder of Palo Alto. Plaintiff will adequately and fairly represent the interests of Palo Alto in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

146.   Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

147.   A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Palo Alto's Board consisted of Defendants Donovan, Key, McCarthy, Zuk, Twohill, Gayle, Goetz, Arora, Bawa, and Eschenbach (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to five of the ten Directors that were on the Board at the time this action was filed.

148.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

149.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Palo Alto to issue materially false and misleading statements. Specifically, the Director-Defendants caused Palo Alto to issue false and misleading statements which were intended to make Palo Alto appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

150. Additional reasons that demand on Defendant Arora is futile follow. Defendant Arora has served as the Company's CEO since June 2019 and as the Chairman of the Board since June 2018. Thus, as the Company admits, he is non independent director. Defendant Arora has received and continues to receive extraordinary compensation for his role as CEO and Chairman of the Board, including $151,425,203 in the 2023 Fiscal Year alone. In addition, Defendant Arora solicited the 2023 Proxy Statement, which contained false and misleading elements which led to shareholders reelecting him, along with Defendants Bawa, Eschenbach, and Twohill to the Board, allowing them to continue breaching their fiduciary duties to the Company and also led shareholders to vote to approve an amendment to the 2021 Incentive Plan which authorized the issuance of additional Company common stock to be used for the Individual Defendants' future compensation. Additionally, Defendant Arora engaged in lucrative insider trading while the Company's stock price was artificially inflated as a result of the Individual Defendants' false and misleading statements, exceeding $159.7 million in proceeds. As a trusted Company director, the Company's highest officer, and the Chairman of the Board, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Arora breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

151. Additional reasons that demand on Defendant Zuk is futile follow. Defendant Zuk founded the Company and has served as the Company's CTO and as a Company director since March 2005. Thus, as the Company admits, he is non independent director. Defendant Zuk has received and continues to receive handsome compensation for his role as CTO and as a Company director, including $8,086,212 in the 2023 Fiscal Year alone. In addition, Defendant Zuk solicited the 2023 Proxy Statement, which contained false and

misleading elements which led to shareholders reelecting Defendants Arora, Bawa, Eschenbach, and Twohill to the Board, allowing them to continue breaching their fiduciary duties to the Company and also led shareholders to vote to approve an amendment to the 2021 Incentive Plan which authorized the issuance of additional Company common stock to be used for the Individual Defendants' future compensation. Additionally, Defendant Zuk engaged in lucrative insider trading while the Company's stock price was artificially inflated as a result of the Individual Defendants' false and misleading statements, exceeding $33.1 million in proceeds. As a trusted Company director and as a Company officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Zuk breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

152.    Additional reasons that demand on Defendant Bawa is futile follow. Defendant Bawa has served as a Company director since May 2021. Defendant Bawa also serves as a member of the Audit and Compensation and People Committees. Defendant Bawa has received and continues to receive handsome compensation for her role as a director, including $356,383 in the 2023 Fiscal Year alone. In addition, Defendant Bawa solicited the 2023 Proxy Statement, which contained false and misleading elements which led to shareholders reelecting herself and Defendants Arora, Eschenbach, and Twohill to the Board, allowing them to continue breaching their fiduciary duties to the Company and also led shareholders to vote to approve an amendment to the 2021 Incentive Plan which authorized the issuance of additional Company common stock to be used for the Individual Defendants' future compensation. As a trusted Company director and as a Company officer, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal

1  controls over reporting and engagement in the scheme, and consciously disregarded her
2  duties to protect corporate assets. For these reasons, Defendant Bawa breached her
3  fiduciary duties, faces a substantial likelihood of liability, is not independent or
4  disinterested, and thus demand upon her is futile and, therefore, excused.

5  153. Additional reasons that demand on Defendant Donovan is futile follow.
6  Defendant Donovan has served as a Company director since September 2012. Defendant
7  Donovan also serves as a member of the Compensation and People Committee. Defendant
8  Donovan has received and continues to receive handsome compensation for his role as a
9  director, including $413,931 in the 2023 Fiscal Year alone. In addition, Defendant
10  Donovan solicited the 2023 Proxy Statement, which contained false and misleading
11  elements which led to shareholders reelecting Defendants Arora, Bawa, Eschenbach, and
12  Twohill to the Board, allowing them to continue breaching their fiduciary duties to the
13  Company and also led shareholders to vote to approve an amendment to the 2021 Incentive
14  Plan which authorized the issuance of additional Company common stock to be used for
15  the Individual Defendants' future compensation. Additionally, Defendant Donovan
16  engaged in lucrative insider trading while the Company's stock price was artificially
17  inflated as a result of the Individual Defendants' false and misleading statements,
18  exceeding $41.3 million in proceeds. As a trusted Company director and as a Company
19  officer, he conducted little, if any, oversight of the scheme to cause the Company to make
20  false and misleading statements, consciously disregarded his duties to monitor internal
21  controls over reporting and engagement in the scheme, and consciously disregarded his
22  duties to protect corporate assets. For these reasons, Defendant Donovan breached his
23  fiduciary duties, faces a substantial likelihood of liability, is not independent or
24  disinterested, and thus demand upon him is futile and, therefore, excused.

25  154. Additional reasons that demand on Defendant Eschenbach is futile follow.
26  Defendant Eschenbach has served as a Company director since May 2013. Defendant
27  Eschenbach has received and continues to receive handsome compensation for his role as

28

a director, including $337,254 in the 2023 Fiscal Year alone. In addition, Defendant Eschenbach solicited the 2023 Proxy Statement, which contained false and misleading elements which led to shareholders reelecting himself and Defendants Arora, Bawa, and Twohill to the Board, allowing them to continue breaching their fiduciary duties to the Company and also led shareholders to vote to approve an amendment to the 2021 Incentive Plan which authorized the issuance of additional Company common stock to be used for the Individual Defendants' future compensation. As a trusted Company director and as a Company officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Eschenbach breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

155.   Additional reasons that demand on Defendant Gayle is futile follow. Defendant Gayle has served as a Company director since May 2021. Defendant Gayle has received and continues to receive handsome compensation for her role as a director, including $346,738 in the 2023 Fiscal Year alone. In addition, Defendant Gayle solicited the 2023 Proxy Statement, which contained false and misleading elements which led to shareholders reelecting Defendants Arora, Eschenbach, Bawa, and Twohill to the Board, allowing them to continue breaching their fiduciary duties to the Company and also led shareholders to vote to approve an amendment to the 2021 Incentive Plan which authorized the issuance of additional Company common stock to be used for the Individual Defendants' future compensation. As a trusted Company director and as a Company officer, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Gayle breached her

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

156.   Additional reasons that demand on Defendant Goetz is futile follow. Defendant Goetz has served as a Company director since April 2005. In addition, Defendant Goetz solicited the 2023 Proxy Statement, which contained false and misleading elements which led to shareholders reelecting Defendants Arora, Eschenbach, Bawa, and Twohill to the Board, allowing them to continue breaching their fiduciary duties to the Company and also led shareholders to vote to approve an amendment to the 2021 Incentive Plan which authorized the issuance of additional Company common stock to be used for the Individual Defendants' future compensation. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Goetz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

157.   Additional reasons that demand on Defendant Key is futile follow. Defendant Key has served as a Company director since April 2019. Defendant Key also serves as Chairperson of the Compensation and People Committee and is a member of the Audit Committee. Defendant Key has received and continues to receive handsome compensation for his role as a director, including $380,335 in the 2023 Fiscal Year alone. In addition, Defendant Key solicited the 2023 Proxy Statement, which contained false and misleading elements which led to shareholders reelecting Defendants Arora, Bawa, Eschenbach, and Twohill to the Board, allowing them to continue breaching their fiduciary duties to the Company and also led shareholders to vote to approve an amendment to the 2021 Incentive Plan which authorized the issuance of additional Company common stock to be used for the Individual Defendants' future compensation. Additionally, Defendant Key engaged in

lucrative insider trading while the Company's stock price was artificially inflated as a result of the Individual Defendants' false and misleading statements, exceeding $709,175 in proceeds. As a trusted Company director and as a Company officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Key breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

158. Additional reasons that demand on Defendant McCarthy is futile follow. Defendant McCarthy has served as a Company director since October 2016. Defendant McCarthy also serves as Chairperson of the Audit Committee. Defendant McCarthy has received and continues to receive handsome compensation for her role as a director, including $370,850 in the 2023 Fiscal Year alone. In addition, Defendant McCarthy solicited the 2023 Proxy Statement, which contained false and misleading elements which led to shareholders reelecting Defendants Arora, Bawa, Eschenbach, and Twohill to the Board, allowing them to continue breaching their fiduciary duties to the Company and also led shareholders to vote to approve an amendment to the 2021 Incentive Plan which authorized the issuance of additional Company common stock to be used for the Individual Defendants' future compensation. Additionally, Defendant McCarthy engaged in lucrative insider trading while the Company's stock price was artificially inflated as a result of the Individual Defendants' false and misleading statements, exceeding $298,306 in proceeds. As a trusted Company director and as a Company officer, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant McCarthy breached her fiduciary duties, faces a

substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

159. Additional reasons that demand on Defendant Twohill is futile follow. Defendant Twohill has served as a Company director since April 2019. Defendant Twohill has received and continues to receive handsome compensation for her role as a director, including $361,045 in the 2023 Fiscal Year alone. In addition, Defendant Twohill solicited the 2023 Proxy Statement, which contained false and misleading elements which led to shareholders reelecting herself along with Defendants Arora, Bawa, and Eschenbach to the Board, allowing them to continue breaching their fiduciary duties to the Company and also led shareholders to vote to approve an amendment to the 2021 Incentive Plan which authorized the issuance of additional Company common stock to be used for the Individual Defendants' future compensation. As a trusted Company director and as a Company officer, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Twohill breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

160. Additional reasons that demand on the Board is futile follow.

161. Defendants McCarthy, Key, Goetz, and Bawa (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and

violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

162.   In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

163.   Palo Alto has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Palo Alto any part of the damages Palo Alto suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

164.   The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and

disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

165.   The acts complained of herein constitute violations of fiduciary duties owed by Palo Alto's officers and directors, and these acts are incapable of ratification.

166.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Palo Alto. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Palo Alto, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

167.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Palo Alto to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

168.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**
### **Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

169.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

170.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

171.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

172.   Under the direction and watch of the Individual Defendants, the 2023 Proxy Statement failed to disclose, *inter alia*: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

173.   The 2023 Proxy Statement also failed to disclose that: (i) the Company's platformization and consolidation initiatives were not being adopted by customers and therefore not driving increased market share; (ii) as a result, the Company's new AI offerings were not facilitating platformization and consolidation; (iii) the Company needed to increase platformization, free product offerings, and other incentives to attract new

customers; (iv) Palo Alto's high billing growth was not sustainable; (iv) the Company could not close deals with the U.S. Federal Government in Fiscal Year 2024; and (v) as a result, there was a substantial risk that the Company would be forced to revise Fiscal Year 2024 expectations.

174.   In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement, including but not limited to the election of the Company's directors and the approval of an amendment to the 2021 Incentive Plan to increase the number of shares reserved for issuance under the 2021 Incentive Plan.

175.   As a result of the material misstatements and omissions contained in the 2023 Proxy Statement, Company shareholders reelected Defendant to the Board, allowing them to continue breaching their fiduciary duties to Palo Alto.

176.   As a result of the material misstatements and omissions contained in the 2023 Proxy Statement, Company shareholders reelected Defendants Arora, Bawa, Eschenbach, and Twohill to the Board, thus allowing them to continue breaching their fiduciary duties to the Company and approved an amendment to the 2021 Incentive Plan that increased the number of shares reserved for issuance under the 2021 Incentive Plan.

177.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 Proxy Statement.

178.   Plaintiff, on behalf of Palo Alto, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

179.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

180.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Palo Alto's business and affairs.

181.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

182.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Palo Alto.

183.    In breach of their fiduciary duties owed to Palo Alto, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (i) the Company's platformization and consolidation initiatives were not being adopted by customers and therefore not driving increased market share; (ii) as a result, the Company's new AI offerings were not facilitating platformization and consolidation; (iii) the Company needed to increase platformization, free product offerings, and other incentives to attract new customers; (iv) Palo Alto's high billing growth was not sustainable; (iv) the Company could not close deals with the U.S. Federal Government in Fiscal Year 2024; and (v) as a result, there was a substantial risk that the Company would be forced to revise Fiscal Year 2024 expectations.

184.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

185.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

186.    In yet further breach of their fiduciary duties, during the Relevant Period,

seven of the Individual Defendants engaged in lucrative insider sales, netting proceeds of over $265.2 million.

187. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Palo Alto's securities.

188. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Palo Alto's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

189. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

190. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Palo Alto has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

191.   Plaintiff, on behalf of Palo Alto, has no adequate remedy at law.

### THIRD CLAIM
**Against Individual Defendants for Unjust Enrichment**

192.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

193.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Palo Alto.

194.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Palo Alto that was tied to the performance or artificially inflated valuation of Palo Alto, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

195.   Plaintiff, as a shareholder and a representative of Palo Alto, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

196.   Plaintiff, on behalf of Palo Alto, has no adequate remedy at law.

### FOURTH CLAIM
**Against Individual Defendants for Abuse of Control**

197.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

198.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Palo Alto, for which they are legally responsible.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

199.   As a direct and proximate result of the Individual Defendants' abuse of control, Palo Alto has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

200.   Plaintiff, on behalf of Palo Alto, has no adequate remedy at law.

## FIFTH CLAIM
### Against Individual Defendants for Gross Mismanagement

201.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

202.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Palo Alto in a manner consistent with the operations of a publicly held corporation.

203.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Palo Alto has sustained and will continue to sustain significant damages.

204.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

205.   Plaintiff, on behalf of Palo Alto, has no adequate remedy at law.

## SIXTH CLAIM
### Against Individual Defendants for Waste of Corporate Assets

206.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

207.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

208.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Palo

Verified Shareholder Derivative Complaint

Alto to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

209.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

210.   Plaintiff, on behalf of Palo Alto, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Defendants Arora, Golechha, and Klarich for Contribution Under Section 10(b) and 21D of the Exchange Act

211.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

212.   Palo Alto and Defendants Arora, Golechha, and Klarich are named as defendants in the Securities Class Actions, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Arora's, Defendant Golechha's, and Defendant Klarich's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

213.   Defendants Arora, Golechha, and Klarich, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Actions.

214.   Accordingly, Defendants Arora, Golechha, and Klarich are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right

of action for contribution arising out of violations of the Exchange Act.

215. As such, Palo Alto is entitled to receive all appropriate contribution or indemnification from Defendants Arora, Golechha, and Klarich.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Palo Alto, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Palo Alto;

(c) Determining and awarding to Palo Alto the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Palo Alto and the Individual Defendants to take all necessary actions to reform and improve Palo Alto's corporate governance and internal procedures to comply with applicable laws and to protect Palo Alto and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Palo Alto to nominate at least six candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding Palo Alto restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff, the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated: May 15, 2024                    Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

<u>/s/Robert C. Moest</u>
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

I, Kenneth Blevins, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 14__ day of May, 2024.

_____
Kenneth Blevins